**PROVIDE TECHNOLOGIES, INC.,**
and Costa G. Chitouras

v.

**EAST COAST HEAT SEAL, INC.**
and Jeffrey Anderson.

**Civil Action No. 96–10077–RGS.**

United States District Court,
D. Massachusetts.

June 18, 1997.

Steven H. Goldberg, Cosgrove Eisenberg & Kiley, Boston, MA, for plaintiffs.

David A. Murray, Forbes & Murray, Boston, MA, Paul C. Newman, Braintree, MA, for defendants.

*MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

Costa Chitouras holds two patents on a process for resealing reconditioned toner cartridges. Chitouras licenses the patents exclusively to Provide Technologies, Inc. ("Provide"). Chitouras and Provide contend that defendant East Coast Heat Seal ("East Coast") is infringing the patents. The Complaint seeks declaratory and injunctive relief against East Coast and its President, Jeffrey Anderson, for inducing and contributing to the infringement in violation of 35 U.S.C. §§ 271(b) and 271(c). Defendants by way of a counterclaim contend that the patents are invalid because Chitouras concealed prior art from the U.S. Patent and Trademark Office ("PTO"). Defendants also allege that the plaintiffs are, through their licensing and litigation practices, restricting competition in violation of the antitrust laws.

The parties agreed to bifurcate the case by deferring discovery related to East Coast's affirmative defenses until after the court determined whether East Coast's product "reads" on Claim 1 of the patents. Plaintiffs now seek a judgment of literal or equivalents infringement. East Coast, for its part, seeks a judgment of non-infringement.

### FACTS

Chitouras holds U.S. Patents Nos. 5,370,-761 (the '761 patent) and 5,460,674 (the '674 patent). Both are entitled "Method for Resealing a Toner Cartridge."[1] Chitouras has exclusively licensed the patents to Provide.[2] Patents '761 and '674 disclose a process to reseal a reconditioned toner cartridge without having to split its casing.[3]

Claim 1 of the patents describes a method of inserting a plastic sealing strip coated with a patterned adhesive into the cartridge and heating it until it bonds to the gasket surrounding the lip of the toner hopper. The seal holds the replacement toner in place until the cartridge is activated by the end-user.

### THE CLAIMS

In Claim 1 of the '761 patent, Chitouras describes his resealing process as follows.

> A method for resealing a toner cartridge having its original seal removed so that the toner cartridge can be recharged with toner and reused, comprising the steps of:
>
> a. sliding a folded plastic strip having an upper portion and a lower portion and a shape corresponding to the original seal into a sealing area within the cartridge, said folded plastic strip having a hot-melt adhesive on a portion of its outer surface in a pattern conforming to the

---

1. The United States Patent and Trademark Office ("PTO") issued Patent '761 to Chitouras on December 6, 1994. The PTO issued Patent '674 to Chitouras on October 24, 1995. The '674 patent is claimed to be a continuation-in-part of a patent application Chitouras filed with the PTO on December 7, 1990.

2. Chitouras is Provide Technologies' chief executive officer.

3. A cottage industry refurbishes used toner cartridges. Rechargers clean the depleted cartridge, replace any worn parts, replenish the supply of toner, and reseal the cartridge for resale. Because the cost of a reconditioned cartridge is substantially lower than that of a new cartridge, the industry is flourishing.

sealing area of the original seal, wherein said hot-melt adhesive is in contact with the sealing area;

b. inserting a blade of a sealing tool between the upper portion and lower portion of the folded plastic strip;

c. heating said blade to a temperature sufficient to cause the hot-melt adhesive to soften; and

d. withdrawing the blade of the sealing tool, whereby the hot-melt adhesive cools and bonds to a sealing surface of the cartridge, thereby resealing the toner cartridge.

Claim 1 of the '674 patent, describes essentially the same technique.

A method for resealing a toner cartridge having its original seal removed so that the toner cartridge can be recharged with toner and reused, comprising the steps of:

a. inserting a blade of a sealing tool between a folded plastic strip having an upper portion and lower portion and a shape corresponding to the original seal, said folded plastic strip having a hot-melt adhesive on a portion of its outer surface in a pattern conforming to the sealing area of the original seal;

b. sliding said blade with the folded plastic strip having the upper portion and the lower portion and the shape corresponding to the original seal into a sealing area within the cartridge, wherein said hot-melt adhesive is in contact with the sealing area;

c. heating said blade to a temperature sufficient to cause the hot-melt adhesive to soften; and

d. withdrawing the blade of the sealing tool, whereby the hot-melt adhesive cools and bonds to a sealing surface of the cartridge, thereby resealing the toner cartridge.

The claims of the patents are identical except that the '761 patent utilizes two insertion tools (one to insert the sealing strip and the other to melt the adhesive) while the '674 patent uses one tool for both purposes.

## THE EAST COAST SEALING METHOD

East Coast's sealing strip is composed of two adhesive layers. The first layer, the bonding layer, consists of two coextruded plastic layers, one of which is temperature resistant.[4] Anderson Dep., at 86. The strip is wrapped around a patterned thermal insertion tool. Id. at 23. The tool is inserted into the cartridge's sealing slot and the strip is heated to approximately 230°F to create a bond with the toner hopper gasket. Anderson Dep., at 23, 62, 74.[5] A bar magnet is used to compress the seal between the tool and the gasket until the bond sets. Anderson Dep., at 131–132.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op. Society*, 3 F.3d 495, 497 (1st Cir.1993). A dispute of fact is only genuine if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir.1994). While all reasonable inferences must be indulged in favor of the non-moving party, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988), a fact is considered material only when it has the "potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993).

## PROCESS PATENTS

■ The Chitouras' patents are "process patents." Unlike a product patent, which gives its owner a monopoly over the manufacture, sale and use of a product "regardless of how and by whom it was manufactured[,]

4. Two different but compatible plastics are combined by extruding them through the same die.

5. Anderson maintains that cooling of the adhesive plays no part in the bonding of the East Coast seal, although he acknowledges that the adhesive is "capable of releasing its bonding characteristics," that is, "it does not stick securely, until a few seconds after the heat has shut off and the adhesive is no longer tacky." Plaintiffs' Statement of Facts ¶ 34.

... [a] process patentee's power extends only to those products made by the patented process. A process patent thus 'leaves the field open to ingenious men to invent and to employ other processes.' " *United States v. Studiengesellschaft Kohle, m.b.H,* 670 F.2d 1122, 1127 (D.C.Cir.1981) (citations omitted).

### LITERAL INFRINGEMENT

■ "A literal patent infringement analysis involves two steps: the proper construction of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–1582 (Fed. Cir.1996), citing *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir. 1995), *aff'd* — U.S. —, —, 116 S.Ct. 1384, 1393, 134 L.Ed.2d 577 (1996). "[C]onstruction of a patent claim is a matter of law exclusively for the court." *Id.* at 977 (citations omitted). In construing the claim, the court should look to the patent itself, the specification and, if in evidence, the prosecution history. *Id.* at 979. "First [the court should] look to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention." *Vitronics Corp.,* 90 F.3d at 1582, *citing Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995). In reviewing the specifications, the court should determine "whether the inventor had used any terms inconsistent with their ordinary meaning." [6] *Vitronics Corp.,* 90 F.3d at 1582. The claims, specifications and file history constitute the patent's "public record ... on which the public is entitled to rely." *Id.* at 1583. Thus, it is inappropriate for the court to consider extrinsic evidence, such as expert testimony, unless required to assist the court in determining the meaning or scope of technical terms in the claims. *Id., citing Pall Corp. v.*

*Micron Separations, Inc.,* 66 F.3d 1211, 1216 (Fed.Cir.1995). If expert testimony is received, it is to be used solely to inform the court's understanding of the patent, and not to vary or contradict terms of the claims. *Markman,* 52 F.3d at 980–981.

■ Utilizing the court's construction, the claims are compared to the allegedly infringing process or device. "To literally infringe, the accused [process] must contain every limitation of the asserted claim." *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1105 (Fed.Cir.1996). If the court finds that there is no literal infringement, it then considers whether the actual differences in the products are insubstantial and whether infringement may lie under the doctrine of equivalents. See *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* — U.S. —, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

### CONSTRUCTION

The Chitouras process begins with a hot-melt adhesive laid down on a folded sealing strip in a pattern conforming to the configuration of the styrene gasket attached to the lip of the toner hopper. Because the various brands of cartridges do not always have identically shaped hopper apertures, the Chitouras method teaches modification of the adhesive pattern on the strip to match the annular opening of the hopper. The blade of the heating tool is placed between the upper and lower portions of the folded seal and inserted into the cartridge sealing slot. The blade is heated to a "temperature sufficient to cause the hot-melt adhesive to soften or melt." See '674 patent, col. 2, lines 51–64; '761 patent col. 2, line 55—col. 3, line 1. The tool is then withdrawn permitting the hot-melt adhesive to cool and bond to the gasket. To prevent any warping of the gasket, the Chitouras method prefers a wax-based adhesive with an activation temperature below 100°C.[7] A major advance of the

---

6. "The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make it and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the best guide to the meaning of a disputed term." *Id.*

7. Defendants claim that their process differs from Chitouras' by not depending on a wax-based adhesive. Chitouras asserts that the hot-melt adhesive specified in the patents is not limited to wax-based adhesives and that he has successfully used pure polymer [i.e. adhesive resins] that were not modified by waxes. Chitouras Dep., at 96–101.

Chitouras method is its ability to achieve bonding at relatively low temperatures. Chitouras Dep., at 27–28, 246, 264–266, 287 and 289. During the prosecution of the '761 patent, when asked to explain the distinction between his process and prior art, Chitouras told the PTO that melting temperatures "of between 100°C and 200°C [specified by the prior art] ... [were] ... far too high for the type of cartridges in use for which Applicant's invention is desirable and would destroy the cartridges." Defendants' Ex. 5, at 9.

*THE COMPARISON*

East Coast's first argument is that the Chitouras process is limited to hot-melt adhesives modified with wax. There is no dispute that the bondable surface of East Coast's seal is not wax-based. Defendants' Memorandum in Support of Summary Judgment, at 14. The patent states that

> [t]he nature and choice of adhesives is an important aspect of this invention. In general, most hot-melt adhesive application temperatures exceed the softening or even melting temperatures of some of the plastics used in the manufacture of cartridges, and are therefore, not useful. It has been found, however, that waxes, preferably modified to optimize certain characteristics, meet the requirements necessary for adhering a polyester (or other plastic seal material), including the subsequent removal and cleaning of the cartridge when additional fillings after the first are attempted. Furthermore, wax-based adhesives can readily be screened onto the plastic seal, unlike most other hot-melt adhesives, which can only be economically laid down in a continuous layer via knife-over-roller or similar coating machines.

'761 patent col. 4, lines 43–59. While a wax-modified adhesive is clearly preferred by the Chitouras method, nothing about the process as described limits the claims solely to such adhesives. The Abstracts to the '674 and '761 patents specifically state that

[t]he utilization of wax-based adhesives and a cold, then heated, insertion tool, ... is the *preferred* embodiment, *but the use of other hot-melt-type adhesives and insertion tools are possible within the purview of this invention.* [Emphasis added].[8]

■ East Coast's second and third arguments, directed to differences in the temperatures the processes use to soften the adhesive for bonding and the manner in which the adhesive is applied to the seal, are more compelling. The Chitouras process heats the inserted blade to a temperature between 140°F and 180°F, causing the adhesive to melt. The blade is then withdrawn, causing the adhesive to cool and bond. The East Coast method heats the adhesive layer to a temperature of approximately 230°F, well above the temperature range within which the Chitouras method is practiced. Anderson Dep., at 62. Plaintiffs counter that claim 1 specifies no temperature limit and that any limits mentioned in the patent are restricted to its dependent claims. Chitouras' answer to the PTO examiner's inquiry, that temperatures between 100°C and 200°C "were far too high for the type of cartridges in use for which Applicants' invention is desirable and would destroy the cartridges," is, however, relevant to a consideration of what is meant in claim 1 by "a temperature sufficient to cause the hot-melt adhesive to soften," that is, a temperature below the 100°C threshold above which, according to Chitouras, warping of the hopper gasket would likely occur. See *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 870 (Fed.Cir.1985).

Another literal difference in the two processes is that the Chitouras method uses a sealing strip with the adhesive pre-patterned to conform to the configuration of the gasket of the hopper, while the East Coast sealing strip consists of an unpatterned bondable surface. Plaintiffs' response that "the only relevant *claim limitation* is that there must be adhesive on a certain portion of the seal, without any regard for how the adhesive came to be there," Plaintiffs' Opposition to

---

8. While East Coast offers evidence suggesting that only wax-modified adhesives work with the Chitouras method, plaintiffs claim that they have used both wax-based and nonwax based adhesives in practicing their resealing method.

Plaintiffs' Statement of Disputed Facts, at ¶¶ 10, 11 and 17. In any event, the question of enablement, the parties agree, is not ripe for determination. See Parties' Proposed Phase I Subject Matter, 96–10097–RGS, Docket Entry # 9.

Defendants' Motion for Summary Judgment, at 13, depends on a tortured reconstruction of the relevant wording of the claim, as evidenced by the generous ellipse in the portion of the language plaintiffs' quote. It also requires reading out of the claim any coherent meaning of the phrase "having a hot-melt adhesive on a portion of its outer surface in a pattern conforming to the sealing area of the original seal." As plaintiffs construe this limitation, "[a]s long as the seal is one 'having' adhesive on the part that will come into contact with the sealing area, it 'has' the required pattern, even if it also 'has' adhesive elsewhere." Plaintiffs' Memorandum in Support of Summary Judgment, at 11. This construction is plausible only if one gives no import to any words of limitation other than "having a hot-melt adhesive ... on [the seal's] outer surface." As defendants point out, plaintiffs' reading of this element of the claim confuses the process (which is protected) with the result (which is not). In sum, the claims as construed differ in a significant enough degree from the undisputed elements of the East Coast process to preclude an award of summary judgment on grounds of literal infringement to plaintiffs, and to compel an award of summary judgment to defendants.[9]

### INFRINGEMENT UNDER DOCTRINE OF EQUIVALENTS

 Under the doctrine of equivalents, an accused product is infringing if it performs "substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–935 (Fed.Cir.1987), *citing Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 901–902 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). However, simply

because two processes are capable of performing the same task does not establish infringement. *Pennwalt Corp.*, 833 F.2d at 937.

> Though the doctrine of equivalents is designed to do equity, and to relieve an inventor from a semantic straight jacket when equity requires, it is not designed to permit wholesale redrafting of a claim to cover non-equivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change.... "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir. 1985) (footnote omitted). To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

*Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–1533 (Fed.Cir. 1987).

An important restatement of the doctrine of equivalents is found in the very recent case of *Warner–Jenkinson Co. v. Hilton Davis Chemical* which, while reaffirming the validity of the doctrine, gives it a narrow construction. The Court acknowledged the concern expressed by the dissenting judges in the Federal Circuit "that the doctrine of equivalents, as it has come to be applied since *Graver Tank*, has taken on a life of its own, unbounded by the patent claims," thus contradicting "the definitional and public notice functions of the statutory claiming requirement." *Warner–Jenkinson*, —— U.S. at —— – ——, 117 S.Ct. at 1048–1049. The Court adopted the suggestion of one of the dissenting judges that the doctrine be refo-

---

9. Plaintiffs dispute some aspects of East Coast's description of its sealing method. Plaintiffs' claim that one of the East Coast layers is not temperature resistant but simply has a lower temperature resistance than the other layer. Plaintiffs' Statement of Disputed Facts, at 9. Plaintiffs also contend that East Coast's 230°F

"activation" temperature is not integral to its process, "that the adhesive has virtually no bonding capability when the temperature reaches 230°F," and that the "so-called bonding layer is actually hotmelt adhesive." Id. See also Stultz Aff. ¶¶ 5–8; Chitouras Aff. ¶¶ 4–10.

cused on an examination of the elements of the competing claims rather than the overall result of the invention.

"[T]hat the accused device or process must be more than 'equivalent' overall reconciles the Supreme Court's position on infringement by equivalents with its concurrent statements that 'the courts have no right to enlarge a patent beyond the scope of its claims as allowed by the Patent Office.' [Citations omitted.] The 'scope' is not enlarged if courts do not go beyond the substitution of equivalent elements." [*Hilton Davis Chemical Co. v. Warner–Jenkinson Co.,*] 62 F.3d [1512] at 1573–1574 [(Fed.Cir.1995)] (Nies, J., dissenting) (emphasis in original).

We concur with this apt reconciliation of our two lines of precedent. Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus, the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*Id.*

With *Warner–Jenkinson* as a guide, I turn to what would appear to be the most pronounced difference in the two processes. Step (a) of claim 1 of the patent teaches the application of adhesive to the seal in a pattern conforming to the configuration of the gasket surrounding the annular opening of the hopper. Under the patented process, heat is applied to the seal in an undifferentiated manner. If the configuration of the aperture of the hopper changes, as it does among competing cartridge brands, a seal with a differently patterned adhesive is substituted. In the East Coast process, it is the adhesive that is undifferentiated and tools with differently configured heating elements that are used to achieve conformity with the configuration of the gasket.

Plaintiffs argue that under the "function-way-result" test infringement occurs because the undifferentiated spread of adhesive on East Coast's seal "serves no purpose whatev-er," and that the end result is the same, that is, in both methods the adhesive bonds to the configuration of the gasket and to nothing else. This argument seems to me to fall into the very trap that *Warner–Jenkinson* warns against, that is, focusing on the end result without paying sufficient attention to the means of achieving it.

The second of East Coast's claimed differences, the higher temperature at which its adhesive becomes pliable (or "activates"), raises squarely the issue of prosecution history estoppel. As previously recounted, when confronted with prior art by the PTO examiner, Chitouras defined the distinctiveness of his process as its viability at temperatures below 100°C, critical in Chitouras' view because temperatures above 100°C as taught in prior art were "far too high for the type of cartridges in use for which [his] invention is desirable and would destroy the cartridges."

In *Warner–Jenkinson*, the Court endorsed prosecution history estoppel as another means of placing "reasonable limits on the doctrine of equivalents, and further insulat[ing] the doctrine from any feared conflict with the Patent Act." —— U.S. at ——, 117 S.Ct. at 1051. While cautioning that estoppel is not to be applied mechanically because "there are a variety of other reasons why the PTO may request a change in claim language," the Court observed that the case for applying estoppel is strongest when without the limiting language "the claim as otherwise written was viewed as not describing a patentable invention at all—typically because what it described was encompassed within the prior art." *Id.* at ——, 117 S.Ct. at 1050.

While the record in *Warner–Jenkinson* made it clear that the patentee had accepted an upward limitation on the operating ph of its ultra–filtration process to distinguish it from a prior patent describing a process operating at a higher level, it was unclear why it had also adopted a lower bound. The Court consequently remanded the case for the Federal Circuit to consider "whether reasons for that [unexplained] portion of the amendment were offered or not and whether opportunity to establish such reasons would be proper." —— U.S. at ——, 117 S.Ct. at

1051. The Court also announced that in future cases

> the better rule is to place the burden on the patent-holder to establish the reason for an amendment required during patent prosecution. The court then would decide whether that reason is sufficient to overcome prosecution history estoppel as a bar to application of the doctrine of equivalents to the element added by that amendment. Where no explanation is established, however, the court should presume that the PTO had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine equivalents as to that element.

*Id.*

Plaintiffs have offered an explanation for Chitouras' answer to the PTO.[10] If I understand the explanation, it is this. Because the patent examiner specifically referenced Yamashita's prior art in his question and because Chitouras specifically referenced Yamashita in his answer, that is, "Yamashita et al. teach hot melt temperatures of between 100 and 200°C which are far too high for the type of cartridges in use for which Applicant's invention is desirable and would destroy the cartridges," the reader should understand that Chitouras was not limiting his claim to temperatures under 100°C, but was also claiming temperatures above that limit, unless these temperatures are sustained for "several seconds" as specified by Yamashita. This oblique explanation seems to run afoul of *Warner–Jenkinson's* determination that

the doctrine of equivalents not become a means of subverting the definitional and public-notice functions of the Patent Act by expanding the claims of a patent beyond the parameters of what a skilled practitioner in the art would recognize as an equivalent.[11]

A more persuasive rejoinder may lie in plaintiffs' assertion that a dispute of fact exists as to whether the 230°F temperature achieved by the East Coast process serves any function at all. While East Coast maintains that 230°F is the activation temperature of its adhesive, that is, the temperature at which it becomes tacky and bondable, Anderson Dep. at 62, plaintiffs contend that the true activation temperature of the adhesive is 175°F, and that at 230°F (which is reached for less than a second), the East Coast adhesive has "virtually no bonding capability" at all.[12] Plaintiffs' Statement of Disputed Facts, at 9. A distinction without a difference would not defeat a claim under the doctrine of equivalents. *Perkin–Elmer Corp.*, 822 F.2d at 1533.

Whether there is an actual dispute of material fact over the activation and bonding temperature of East Coast's adhesive, or whether the dispute is merely a speculative contrivance, is impossible to say on the present record. Cf. *Warner–Jenkinson*, — U.S. at —, 117 S.Ct. at 1053 (endorsing in dicta the Federal Circuit's holding that "it [is] up to the jury to decide whether the accused process [is] equivalent to the claimed process.") But that leaves still the differences in the method by which the two processes apply adhesive to the seals to produce the desired bonding configuration. If the meth-

---

**10.** I am mindful of the fact that plaintiffs have taken the position that because of their belief that the East Coast process literally infringes the melting temperature element of claim 1, they are not attempting "to capture the defendants' system [in this regard] under the doctrine of equivalents." Plaintiffs' Memorandum In Opposition to Defendants' Motion for Summary Judgment, at 16. In light of my finding of no literal infringement and the holding in *Warner–Jenkinson*, this is a position plaintiffs may wish to reconsider.

**11.** The explanation requires that the practitioner understand "Yamashita et al." to mean "Yamashita," that the relevant reference is to Yamashita's use of the phrase "a few seconds," that the phrase "a few seconds" means "sustained temp-

eratures above 100°C," and that the reinterpreted phrase should be read back into Chitouras' answer as a qualification to what would otherwise read as a flat surrender of any claim to a temperature above 100°C.

**12.** The parties also dispute whether cooling of the East Coast adhesive plays a part in the bonding process. Plaintiffs claim that "pull force" tests performed on East Coast's seal demonstrate that the seal has "the performance characteristics common to such [hot-melt] adhesives, including softening when heat is applied *and achieving effective bonding strength only after the heated and softened adhesive is allowed to cool.*" [Emphasis supplied]. Stultz Aff., at ¶ 4. See also Chitouras Aff., ¶¶ 7–10.

ods are substantively different in this respect (I am inclined to think that they are), under my reading of *Warner–Jenkinson,* the doctrine of equivalents would not save plaintiffs' claim of infringement. Cf. —— U.S. at ——, 117 S.Ct. at 1054 (equivalence must be determined "on an element-by-element basis," and not on the basis of overall result). I am sensitive, however, to the fact that the parties did not have the decision in *Warner–Jenkinson* at the time their main briefs were filed and had agreed to bifurcate discovery to expedite consideration of the infringement issue. Consequently, I will withhold a decision on defendants' motion for summary judgment until plaintiffs have had the opportunity to brief the issue of equivalence further or to seek additional discovery, if necessary.

### ORDER

For the above stated reasons, plaintiffs' Motion for Partial Summary Judgment is *DENIED.* Defendants' Motion for Summary Judgment is *ALLOWED* to the extent that the court finds that on a proper construction of claim 1 no literal infringement by the defendants can be found. Plaintiffs are granted leave to submit within twenty-one (21) days of this ORDER further briefing as to the existence of a triable issue of fact under the doctrine of equivalents, or an explanation of why further discovery might be necessary as a predicate.

SO ORDERED.