ZIP DEE, INC., Plaintiff,

v.

DOMETIC CORPORATION, Defendant.

No. 93 C 3200.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 4, 1998.

See also 63 F.Supp.2d 913.

Harry M. Levy and James J. Hill of Emrich & Dithmar, Chicago, IL, for Plaintiff.

Peter V. Baugher of Schopf & Weiss, Chicago, IL, Ira S. Sacks, David R. Buchanan and Jeffrey D. Sullivan of Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This multifaceted and bitter dispute between Zip Dee, Inc. ("Zip Dee") and Dometic Corporation ("Dometic") has ranged across fully a dozen years and two lawsuits—one being between Zip Dee and A & E Systems, Inc. ("A & E"), the prede-

cessor of current defendant Dometic, and the other being this action.[1] Both lawsuits have implicated various aspects of intellectual property rights relating to the metal covers for awnings that provide shelter from the elements (both sunlight and rain) for the owners of recreational vehicles (when those vehicles are at rest).

As the Appendix reflects, this litigation alone has spawned a lengthy series of opinions by this Court to deal with its numerous complexities in both the trademark-trade dress and the patent areas of law, including in part issues stemming from the impact of the earlier Zip Dee–A & E litigation lost by the latter. What is now at issue is the *Markman*[2]-dictated determination of the construction of the claims in Zip Dee's United States Patent No. 4,634,172 (" '172 Patent"), which claims Zip Dee contends are infringed by Dometic's Model 9000 Awning ("Model 9000").

Here are the two relevant claims (Claims 1 and 6) in the '172 Patent:

1. A flexible connector for connecting a metal awning cover to a vehicle, comprising a flexible water-impervious strip, means for connecting one end of said strip to the vehicle, and means for connecting the other end of said strip to the metal awning cover, whereby when the awning is in use or in an extended position said flexible strip is under tension providing a water-tight seal between the awning cover and the recreational vehicle.

6. In a recreational vehicle having a first longitudinally extending rail C-shaped in transverse cross-section and a roll-up awning having a metal cover with a second longitudinally extending rail C-shaped in transverse cross-section, the combination therewith of a water proof connector, said connector comprising a pair of rods, each rod being capable of fitting within one of the first and second C-shaped rails, a flexible water-impervious fabric connecting said pair of rods constructed and arranged to provide a water tight connection between the first and second C-shaped rails when said fabric is under tension, whereby water is prevented from flowing between the recreational vehicle and the metal cover for the roll-up awning when the awning is extended and said flexible water-impervious fabric is under tension connecting the recreational vehicle and the roll-up awning metal cover.

Dometic views not only the terms "water-impervious," "water-tight" and "water-proof" (terms that Zip Dee agrees must be judge-defined under *Markman*) but also "tension" and "connector" as requiring judicial construction. Although Zip Dee differs as to the need for judicial definition of those last two terms, it has offered its own views in case this Court rejects its position. This opinion will address each of the subjects on which the parties part company.

■ For purposes of the *Markman* analysis, Dometic properly leads off the discussion in its opening-gun Memorandum by pointing to the importance of *intrinsic* evidence (that is, evidence in the patent itself) in interpreting claims—after all, one important principle underlying the full-disclosure approach of the patent statute and caselaw is that readers of a patent are entitled to rely on the objective meaning of the language used by the inventor. Thus Dometic Mem. 5 quotes from *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996) (citations omitted):

In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to

---

1. See Appendix.

2. For any law-trained reader who has spent the last two years in outer space, or whose allergy to patent law is such as to create a total blockage whenever any patent-related subject arises, the text reference is to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), *aff'g* 52 F.3d 967 (Fed.Cir.1995).

rely on extrinsic evidence. In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.[3]

And Dometic's counsel then go on immediately afterwards at Mem. 5 to criticize Zip Dee's approach to the current issues:

In this case, Zip Dee is attempting to do exactly that which the Federal Circuit in *Vitronics* condemned—"alter" the public record by introducing the testimony of its president and other extrinsic evidence that is contrary to the unambiguous meaning of the claims as revealed by the intrinsic evidence of the specification.

But then having staked out that position, Dometic's counsel ironically proceed to quote—with an extensive use of boldface type—from a 1986 Zip Dee advertisement in *Camp-orama* magazine (Dometic Mem. 14) and from the 1988 opening statement to the jury by Zip Dee's lawyer in the prior litigation between Zip Dee and A & E (*id.* at 15). Although this Court recognizes the appeal of such notions akin to estoppel, Dometic really should not be enabled to advance that level of inconsisten-

cy. As *Vitronics* and like cases expressly direct, and as this Court will do in its ensuing Markman analysis, Dometic too should be limited to examining the intrinsic evidence as to the meaning of the critical language in the patent claims.

### "Water–Impervious," "Water–Tight" and "Waterproof"

■ In this first area Dometic adopts a Gertrude Stein "Rose is a rose is a rose" approach. It simply urges the literal meaning of the terms "water-impervious," "water-tight" and "waterproof" as denoting something that permits no water passage at all.

Zip Dee responds by proffering a number of arguments that would give a different content to those words, a content that would permit moderate quantities of water to pass the "water-impervious," "water-tight". or "waterproof" barrier. If Zip Dee were to be successful on that score, the consequence would be that the factfinding jury would be instructed that those terms would mean:[4]

that the amount of water passing through the grommeted fabric strip of the Dometic awning is negligible or so small that it does not defeat the overall purpose of the invention under a not insubstantial range of realistic rainfall and a not insubstantial range of normal awning mounting angles.

But suffice it to say that Zip Dee's several contentions that would reach that result find no internal support in the patent itself. This Court therefore rejects the strained reading advanced by Zip Dee, in favor of giving all of those words their normal meaning of true imperviousness: No liquid gets through.

---

3. [Footnote by this Court] Though *Vitronics* was handed down very shortly after *Markman* and has been succeeded by a host of Federal Circuit decisions that also discuss and apply the *Markman* approach, *Vitronics* continues to be cited and quoted regularly as the leading expression of the Federal Circuit's views on the subject.

4. What follows in the text is taken directly from pages 5 and 6 of Zip Dee's proposed jury instructions, those pages being intended to reflect this Court's *Markman* determinations that will be binding on the jury.

Before this opinion turns to any of the other terms that are arguably at issue, the direct consequence of Dometic's just-successful contention as to the '172 Patent's use of "water-impervious," "water-tight" and "waterproof" is plain indeed. As *Vitronics* and a host of other cases teach, either Dometic or anyone else is free to engineer around the patent by practicing its art slavishly (what in more jingoistic days used to be called making a "Chinese copy") *except* for eliminating some element of the claims—in this instance the element of water-imperviousness.

So what Dometic's lawyers and engineers have done is deliberately to insert some grommets into the Model 9000 awning—grommets that just as deliberately permit some water coming from the heavens on a rainy day to pass through the initial surface of the fabric.[5] If that entirely permissible step had been the only one taken by Dometic's counsel and its engineers, there would have been no legitimate basis for this lawsuit by Zip Dee (subject to the qualification stated in the next paragraph)—but of course Dometic wouldn't have been too likely to have any customers for its product either (who after all wants to sit or stand under an awning in inclement weather and have "Raindrops Keep Falling on [His or Her] Head"?). Hence Dometic did something more: Its

ingenious putative patent evaders have been compelled to provide another layer of truly water-impervious material (the same awning fabric) that is placed immediately below the strip containing the grommets to catch the water coming through before it soaks the Dometic customers.

Even without reference to the legal effect of that last step, Dometic's hole-punching efforts may not necessarily provide an end to the story as to its possible infringement of the '172 Patent. Despite the no-tolerance reading of water-imperviousness that has been urged by Dometic and has now been approved in this opinion, the question would still remain for the factfinder whether for a substantial range of the angles for awning usage and a substantial range of rain conditions the grommets that have been introduced into the Model 9000 actually make no difference in real-world operational terms—that is, whether within those ranges there is in fact *no* passage of water through the grommets. If that is so, such cases as *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 815 F.Supp. 1488, 1512 (D.Del.1993), *aff'd* 18 F.3d 927, 931 (Fed.Cir.1994)(expressly approving "the competent and workmanlike nature of the [district] court's infringement analysis") indicate that infringement of the '172 Patent by the Model 9000 may still exist.[6]

---

5. Only a patent lawyer, in an effort to get around a patent infringement claim, would think of using an otherwise water-impervious fabric whose entire value consists of its permitting no water passage at all (an awning that is intended to provide total shelter from the rain), then punching holes in it to let water through. To continue with the Oriental motif adverted to in the preceding paragraph of the text, this is reminiscent of the old joke in which a Chinese visitor comments in bewilderment at the American fondness for converting China's national drink into iced tea:
First the American boils the tea to make it hot, then he puts in ice to make it cold. Next he puts in lemon to make it sour, then he puts in sugar to make it sweet. And finally he says "Here's to you" and drinks it himself.

6. Here is what the *Interspiro* District Court said after confirming the alleged infringer's

"every right to design around the ['172] patent" (brackets both here and in the following quotation indicate changes to adapt that opinion to this case):
Finally, it is of no moment that in certain modes of operation...the [Model 9000] may not operate in a way that would infringe the ['172] patent. It matters only that the accused device operates in an infringing way at some time; that is the case here.
On that premise, Zip Dee's tendered jury instructions set out in the text following n. 2 would be revised to read essentially this way:
that no water would pass through the grommeted fabric strip of the Dometic awning except under a not insubstantial range of realistic rainfall and a not insubstantial range of normal awning mounting angles.

Dometic Supp. Mem. 9 protests that such is not the case—that the very presence of the grommets negates the potential of literal infringement on that score. But that really represents an argument as to factual likelihood, not certainty, as to the manner of operation of the Model 9000. And that poses a subject for resolution in a trial context different from the present *Markman* legal construction stage, rather than supporting a holding adverse to Zip Dee now.

But whether or not the last-discussed possibility is taken into account, it is necessary to parse some other aspects of the '172 Patent's claims to see what further *Markman*-type determinations may be needed to aid the jury in its factual determinations. This opinion thus turns to those considerations.

### "Connector"

■ Having either potentially or actually dodged one '172 Patent bullet by causing one layer of naturally-waterproof fabric to become non-water-impervious, Dometic must find a way to keep its customers dry while at the same time it keeps itself out of harm's way in the form of the '172 Patent's claims. To accomplish that, Dometic blithely abandons its insistence on looking at the intrinsic evidence of the patent itself by fabricating a distinction that is found only in its own mindset, not in the patent. Dometic Mem. 9–10 raises the straw man of "series" versus "parallel" types of awnings, urging in the Memorandum's ensuing discussion that the '172 Patent claims are directed only to the former type.

But that contention, which rests on Dometic's characterization of the invention as an "awning connection," amounts to reading something either into or out of the actual claims of the '172 Patent. Those claims clearly specify that the invention is a device connecting a metal awning *cover* to the recreational vehicle. That plain meaning of the '172 Patent's language appears to require no artificial gloss of the type contended for by Dometic's asserted division into "parallel" and "series" awnings.

This Court sees no need as part of the threshold *Markman* procedure to provide a construction other than the normal reading of the term "connector." It is however worth adding, in light of Dometic's arguments, that this Court does not expect to prevent the factfinding jury from considering the possibility that because of the stitching that Dometic has employed to create an integrated construction that will keep any water from penetrating that construction, Dometic's accused device may still be viewed as constituting a water-impervious strip (comprising the combined layers of fabric) that is connected to the recreational vehicle at one end and to the metal awning cover at the other.

### "Tension"

■ Here too no *Markman*-type construction seems to be required that would add a definition beyond the ordinary English language meaning of the term "tension." Once again Dometic offers up an artificial construct to advance its position, a construct in which the connector that is the subject matter of the invention must support the entire weight of the awning (repeating the notion of the "series" connector), although the patent claims do not prescribe any limitations in terms of weight—let alone the quantity of weight involved. In short, the '172 Patent's references to "tension" will go to the jury without the interposition of any judicial gloss.

### Doctrine of Equivalents

■ Just over a year ago the Supreme Court provided valuable definitive insights into the use of the doctrine of equivalents in *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997):

Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and

thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, it not allowed such broad play as to effectively eliminate that element in its entirety. So long as the doctrine of equivalents does not encroach beyond the limits just described, or beyond related limits to be discussed *infra*, at 1051–1052, 1053, n. 8, and 1054–55, we are confident that the doctrine will not vitiate the central functions of the patent claims themselves.

Dometic correctly points out that equivalency under that doctrine does not consist in an accused product's merely performing the same overall function as the invention, at least in the absence of element-by-element equivalency (see such cases as *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1424, 1425 (Fed.Cir.1997)).

But that only highlights the question that this Court has posed to the litigants from the beginning and that has been adverted to briefly earlier in this opinion—a question that may bear analytically on the existence of equivalency in any event, or may perhaps bear on direct infringement itself. That is the question whether or not, as Dometic has chosen to practice the art in an effort to take an end run around the '172 Patent, its Model 9000 device properly understood may still run afoul of Zip Dee's claims.

As already said, what Dometic has done is to create a nominally water-transmitting layer of waterproof fabric by introducing spaced grommets to let some modest amounts of water through at specific limited locations. But to maintain a marketable product, it was compelled at the same time to undo the effect of that deliberately-introduced water by permanently attaching another layer of the same waterproof fabric (what Dometic euphemistically terms a "drip pan") immediately below the entire area where the grommets are located.

Again that seems to present the issue whether the factfinder could consider the entire assemblage, including that integrated section, as Dometic's "connector" within the meaning of the '172 Patent. If the jury so found, it would seem that either literal infringement or infringement under the doctrine of equivalents could well follow.

### Conclusion

This opinion has dealt with the *Markman* issues to the extent deemed necessary to put the case before the jury in an informed way. Because what has been said here will necessarily impact on some of the jury instructions that the parties have previously tendered, and because it is now appropriate to see what further pretrial arrangements are needed, this action is set for a status hearing at 9:30 a.m. August 12, 1998 to discuss both the timing for those revisions in the proposed instructions and any further procedures that are needed to set the case for trial.[7]

### Appendix

It would be difficult (and even worse, quite depressing) to try to give an adequate account of the many struggles that have marked this litigation—let alone the prior litigation between Zip Dee and Dometic's predecessor A & E, which began back in 1986 and found its way up to the Court of Appeals for the Federal Circuit on two separate occasions. But the general flavor may be gleaned from the manner in which this Court began its July 1996 memorandum opinion and order (931 F.Supp. 602, 604):

> This long and contentious litigation between Zip Dee, Inc. ("Zip Dee") and The Dometic Corporation ("Dometic") has

---

7. If Dometic wishes to have its New York counsel participate in that status hearing, its local counsel should arrange with this Court's minute clerk and Zip Dee's counsel to place a telephonic conference call for that hearing promptly at 8:30 a.m. (Chicago time) on August 12.

continued to pose so many and varied issues as to assume almost mythic proportions. Unfortunately the myth most often called to mind, as this Court has been called upon to resolve the parties' numerous disputes, has been the fifth of the Labors of Hercules—the cleansing of the Augean Stables. Or perhaps, given the manner in which the same or closely related tasks seem to reappear frequently in somewhat altered guises, the somewhat more elegant reference should be to the punishment visited on Sisyphus.

That opinion, however, did not bring an end to matters. To the contrary, this Court's next published opinion of December 27, 1996 (949 F.Supp. 653) had the occasion to set out in Appendix form (*id.* at 658–60) the 13 prior written opinions of varying lengths that this Court had been compelled to issue. And because another opinion (this time unpublished) has intervened between then and now, the text here becomes number 16—and it can only be hoped that the end is in sight.